Sherman versus Trinity Teen Solutions. It is Docket 22-8080. Mr. Timmons. Yes, Your Honor. My name is Bryce Timmons and I represent Carly Sherman and it goes and Amanda Nash who are plaintiffs in a putative class action against Trinity Teen Solutions. This case concerns the application of Rule 23 class certification to the Trafficking Victims Protection and Reauthorization Act. Okay, counsel, again, I hate to jump in, but as I read what was going on here, too, in addition, the district court was, I couldn't find any, was saying that there was a parental exception to it where I consent to my kids going there. Wasn't that partly the problem in regarding whether there was a class action here? That is one of the two reasons that we're asking this court to reverse the district court. Okay, so it's both of those reasons, not just the one you just said. Well, the court, in applying Rule 23, the court considered what it called an individualized analysis of the parental consent issue. But it looked to me, correct me if I'm wrong, that appears to be the basis, the primary basis of what the trial court did in this case. Am I missing something? Well, I know opposing counsel will tell me if I'm missing something there. There are two bases that the court relied upon, Your Honor. The first was the individualized determination of parental consent or what we call parental consent defense or parental consent exception. The second was that the trial court determined that individualized damages considerations should defeat class certification, which is directly contrary to this court's holding in Menocal. The simple fact is that parental consent is not a defense or a relevant consideration at all to the TVPRA. Okay, but let's just get defense off the table. The district court never said that, right? The district court said that it required an individualized examination. And so then the question is, why does it require an individualized examination? There are five elements to a violation of the TVPRA. The first is that there must be labor. The second is that that labor must come from coercion. Well, let me stop you there. Isn't there an individualized inquiry required for whether these young adults provided labor? There is not, Your Honor, because there's a uniform scheme. But they didn't all do the same thing. Well, they did, Your Honor. They all provided ranch labor. Well, there's ranch labor and then there's ranch. I mean, you know, you might have some who worked in the kitchen. You might have some that were working on an irrigation system. And there might be a question about how much of that is the kind of normal household labor that we have a ruling that says you can do without violating the statute. First of all, Your Honor, that really goes to the question of individualized damages. How much time did anybody spend doing any one thing? Well, it goes to both because you have to show they provided labor. Yes, Your Honor. And if we have, if you look at the record, on page 611 through 614, Angela Woodward, the owner of TTS, stated in her deposition that the labor performed by residents was all labor typical of a ranch hand. And at 644, she testified that out of the approximately 255 residents of TTS within the statute of limitations, all but one to three conducted the 13 types of labor typical of a ranch hand that are consistent with the definition of agricultural labor used by the Bureau of Labor Statistics. She could identify none of those individuals with specificity. Jerry Woodward indicated that ranch hands work sunup to sundown, doing labor, and that the girls did labor typical of a ranch hand. That's at page 396 of the record. Also at 396 of the record, Jerry Woodward stated that ranch hands are typically paid by the month to do whatever labor is necessary on the ranch, not on an individualized hour-by-hour basis, but paid by the month. He is also one of the owners of Trinity Teen Solutions. And then you'll note in the orientation materials at page 843, you'll see that the Trinity Teen Solutions own orientation materials state that the labor is dependent on the needs of the ranch. So even though these are distinct activities, the court should look at them as all factors, all categories of agricultural labor. Now, the trial court suggested that we were seeking damages for time they spent in education or in therapy. That's simply not accurate. Those are not available under the TVPRA, and we don't concede that they are. But the Department of Labor's definition of agricultural labor is all that we're seeking damages for. Now we're seeking prevailing hourly wages for agricultural labor. Why isn't this an FLSA case? I have trouble getting through this notion that we're talking about trafficking here, and I've not been able to find a single case that involved therapy being jammed into this statute. But I understand the position that maybe they should have gotten something for their effort, which would probably mean that Trinity would charge the parents to pay the kids. Well, Your Honor, after the analysis with our clients, we determined that the issue here was that there was compulsory labor, not that there was a violation. We determined a violation of the Fair Labor Standards Act was not the correct approach. But sometimes labor can be labor, and sometimes labor can be therapy, right? There is no case that holds that. In fact, there is a case in the Tenth Circuit that I will remember the name of momentarily, I hope, that says that that is where labor is simply performed under the guise of therapy. That does not defeat prostitution under these. It's an entirely different situation from had a ranch imported legally or illegally, people who were not in therapy but instead were doing ranch work and threatened that if they complained they'd deport them and beat them up and so forth. That fits under trafficking. This one, parents who have troubled teens that they apparently can't control and are looking for them to get some direction and maturity, send their children there, and they look at the materials, they see, oh, going to be working with animals, going to be working with their aggregation. They're going to be tired at the end of the day, and they're going to get an appreciation for what the real world is all about. Two different things. Well, Your Honor, first of all, I grew up on a farm, and I understand that. But second, Your Honor is focusing on the definition of trafficking set out in Section 1590 of the statute. This case is brought under Section 1589. Section 1589 deals with coerced labor, and Congress specifically referenced, and you'll see this in our brief, that agricultural labor makes up, in fact, I think I have a quote here, Congress explicitly considered agricultural labor as among the industries the most prominent industries in which labor trafficking is done, and noted that 50% of the individuals are minors. Well, Claim 1 and Claim 2 are 1589, aren't they? That's right. And Claim 3 is 1590, so it's appropriate to look at 1589, is it not? Right, Your Honor. I think we've got those reversed. 1589 is the coerced labor portion, I believe. I could be wrong, of course, but my recollection is that the concern here... You have claims under both, is my point. The concern here, Your Honor, is that this labor was coerced, not that it was obtained by defrauding the parents, not that the, if the children were trafficked... And I don't want to decide the merits, because I know that's not really what's before us, and I know Judge Gavdol has denied the motion to dismiss on what I'm talking about, and said at this stage of the proceeding. But at the same time, reading these class action certification cases, they say the merits can bleed into the commonality question and so forth. And that's why I'm pointing to this language saying, how does that fit? And how would the ranch owners know or should have known that they're acting in a violation of this chapter if there are no cases out there where you have this therapy situation? And I don't want to chew up all your time, but I want to ask you, when can you pick up the merits and get it into the class action question to where I can look at that? And maybe I'm too soon. Well, I think this is premature, Your Honor. This is a question for a jury. Did this scheme, this common scheme, constitute agricultural labor? Did it, was this labor, were the methods used to obtain that labor in violation of the statute? Could you have had a claim under the FLSA, and if not, why not? Your Honor, I'm not an FSLA lawyer, so I can't answer that question. I'm happy to submit a Rule 28J letter after exploring it if the court would like to. That's okay. I thought we, you just mentioned about a jury question. The issue we have before us is, did the district court apply the wrong rulings as to determine whether it qualified as a class action? That's what we have before us here. That is correct, Your Honor. Okay. What I'm saying is that Judge Phillips' question about the merits is a question for a jury. And if we agree with you that the court did not properly apply the standard for certifying a class, the remedy would be to remand for the court to reconsider under the proper test. That is correct, Your Honor. Okay. And so is it your position we should not look beyond the bases that was articulated by the district court, and in the first instance look and see if instead of looking at the in loco parentis issue, we look beyond that to see if there were individualized different issues than damages? Well, yes, Your Honor. But first I would like to point out that as the Department of Justice has urged in its amicus brief, we would ask this court to rule that the TVPRA, or rather hold that the TVPRA, does not contain an exception from parental consent. Yeah, I'm with Judge Phillips. I don't think that's what the district court ruled, that it was a defense to the TVPA. Well, if it's not a defense, it certainly doesn't go to the question of whether something is labor. It doesn't go to the question of whether something is coerced. It does not go to the question of the scienter requirement for the defendants. So if the trinity here had paid $15 an hour, would there be a lawsuit now or not? Using these same coercive methods, yes, Your Honor. The question isn't whether they were or were not paid. The question is whether they were coerced to perform the labor using illegal means.  Two remedies, Your Honor. The first remedy is a prevailing hourly wage if they were not paid. That's where I'm saying if they had been paid. That would reduce the damages. So we'd be down to emotional distress. And then there would be the emotional distress damages plus the possibility of punitive damages. And if you look at all the case law examined, and it's all district court cases, but if you look at all the district court cases applying this, or prevailing hourly wage, which is supported by this court's precedent in the Francisco case, where it held that the prevailing hourly wage was appropriate, then emotional distress damages and punitive damages. So how will this ultimately be settled as far as money, assuming you prevail? Different people, different girls were there for different periods who did different things, who contended different services rendered, qualifies labor. The district court, of course, looks at it and says to itself, how am I ever going to figure all this out? Why don't you just do it individually? And that has a reasonable aspect to it. Well, Your Honor, I would suggest that where things have been so standardized as they are here, the court would look to the record at 942 where they'll find a daily supervision checklist that identifies each specific type of task that each girl was performing, what they were doing, when they were doing it. And so the court can determine what is and is not labor, resolve that question at a stroke. And that's the common question. That is one of the common questions. That predominates. That predominates, yes. The court can determine whether the methods used were coercive and resolve that at a stroke. Because we have a common scheme. Ms. Woodward, Defendant Angela Woodward, testified that the manual at 16, this is in the record at 618 through 621, contains a set of uniform punishments. And you will also find in the record at page 875 an actual log called a guardian angel log for each girl who was in the program and where the punishments are standardized and collected. And so the court can determine at a stroke whether any of these methods constituted coercion within the meaning of the TVPRA and whether some of those did not. And then, assuming that the court cannot, and I would actually like to point out also in the record, at page 325 through 327 the court will find the report of Dr. Sarah Boyd, which the district court explicitly did not consider in its ruling. And Dr. Boyd testified, included in her report, that there was no possible legitimate therapeutic purpose behind any of the labor. The use of these types of agricultural labor as therapy was completely unsupported in all scientific literature and in the treatment of juvenile mental health conditions. That opinion was unrefuted in any of the defense's expert reports. So the court should consider those factors, should consider those expert reports, in making a determination as to class certification. I believe I'm out of time. If the court does not have any further questions. Thank you, counsel. May it please the court. I'm Tom Quinn. I represent the defendants in this case. I'd like to start off, and I think that I heard the court comment in the same way that I would start my brief. And that is, at the heart of this appeal is whether Judge Skavdal's ruling in denying class certification has been fairly portrayed in the appellant's briefing, and again here today. And I came here to this podium to say that I think there was two distinct areas in which Judge Skavdal's ruling was not fairly portrayed, and I just added a third one. Let me go through those quickly as I began. First of all, Judge Skavdal did not say parental consent is a complete or some sort of affirmative defense to the TVPA. I agree with that, counsel. Rather, what he said was it was a core issue in this case, in the evidence presented in this case. Judge Skavdal did not say individual damages analysis is a singular reason for denying class certification. That's not what he said. What he said was the individual nature of the damages evidence presented by the plaintiffs in their case in chief was a consideration determining there was a commonality and typicality under 23A2 and 3. That's what he said. Just now plaintiffs said it again, as they said in their brief, that Judge Skavdal did not consider Dr. Boyd's presentation regarding the therapeutic nature of ranch work or ranch chores in treatment for these behavioral teens. That's not what Judge Skavdal said. He said he accepted it as true, Judge Boyd's testimony, or as accurate or as considered, but it would not change his opinion. So those are three specific reasons I want to bring this court's attention right off the bat. As I prepared for this, I tried to crystallize the issues that we would be addressing here today. Let me ask you this. Yes. What's our standard of review here? Pardon? I'm sorry. What's our standard of review? Your standard of review is abuse of discretion. Well, it's de novo on the issue of whether it was the correct test applied in the district court and abuse of discretion on application if it was the correct test. Would you agree with that statement? I would. So the threshold would be de novo, and then once you cross that, it would be abuse of discretion. Right. And so the point that I think is being raised in this appeal is on the first issue, was that the district court judge did not apply the correct test. The correct test on Rule 24? Well, in a number of places, but starting with commonality, that it doesn't have to be common as to all questions. There just has to be commonality as to a question, and they point to the question of whether ranch labor is labor for purposes of the TPVA. Is that right? Yeah. Or whether it's simply household chores. I think it's the Sixth Circuit decided that you can order, and in fact, in that case, beat kids to make them do household chores. I wish I'd known that when my kids were younger. But anyway, so isn't that a common question? Every single case here depends on whether these ranch activities qualify as labor for purposes of that act. Correct. So that's the evidence that has been. Right. I think so far we're tracking each other. But what Judge Scavdall looked at was a totality of evidence presented to him by the plaintiffs on their burden of proof on this threshold question. So I was just about to go to this, and I think I can answer that from the DOJ brief. Okay, so when you say the threshold question, I want to make sure we're talking about the same thing. You mean whether these ranch chores were, quote, labor for purposes of the act. Forced labor for purposes of the act. Well, that's two issues. One is labor. Labor or forced labor. Second is coerced, right? This is chores, and the chores can be dictated, for lack of a better term, by a parental or its designee. And in this case, so TTS is the designee. So now we get to the question of whether something is labor, forced labor, or a chore. And that is the threshold. I think we're at the threshold question. Well, and so my question to you is taking first whether it is labor isn't that common throughout the class, whether it is or isn't labor. Either these ranch chores are or are not labor. No, because now we're in a behavioral health situation. And so we have parents that have... I don't care about parental, whether you have, I will assume that your trinity is in the position to order these kids to do these chores. Right. The question statutorily is, is it labor? But you have to identify that on an individual basis because each person... Well, so you're saying irrigation work might be labor, but slopping the hogs might not. Is that your position? It could be, yeah. It could be because each plan of treatment had varying degrees of tasks identified for the individual person. So because person A might be irrigating and person B might be doing kitchen chores, you can't say that that's a class... Not everyone was doing irrigation. Not everyone were grooming horses. Not everyone was fixing fences at the same time, in the same season, under the same manner. Well, does it matter if it's the same season? I mean, the first question is, fixing a fence, labor, or is it akin to a household chore that you can order kids to do? I think that is a threshold question, but it applies to the individual as well. So you're saying it's different individual by individual whether fixing a fence is labor? No, I'm saying it's different individual by individual whether they ever participated in it in the first place. Okay. And what about whether it's coerced? Is that a common question? We know what the punishments that were available were. So it's not punishment. It's treatment and it's consequences. There's a difference there. Okay, we know what the consequences were for not performing. Does that create a common question as to whether this chore slash labor was coerced? Say it one more time. I just want to make sure I answer your question. Is there a common question throughout this class whether the task or chore that an individual did was coerced by the consequences resulting from not doing it? I would say no, because we are in a treatment situation. You're putting this in a labor. The plaintiffs have cast this as a labor case. This is a behavioral treatment case. Is there a defense to the TPVA for treatment? No, because I think it's misuse of the TVPA in the first place to apply it at the behavioral treatment or a healthcare setting. It seems to me you're getting into the merits instead of the issues relevant to class certification. I apologize if I am. I'm trying to respond to the question that's presented. I apologize if I moved off on that. But there is a concern the district court felt that to meet the commonality element, there had to be more than one issue in common. There's language to that effect, as I recollect. Can you say that one more time? Sure. My concern is with the commonality element at the moment. As Judge McHugh points out, one issue of fact or law in common is enough to satisfy that element. That doesn't really read correspondingly with what the district court said. Do we need to reverse and remand on the commonality? Or even if the district court was wrong on that, will predominance save it? Here's what I see the district court doing. It took the evidence that was presented to it by the plaintiffs. It said the issues are disparate across every class rep and pugitive class member. Therefore, because all of these issues of disparity exist between them, you can't have commonality or typicality. The class vehicle or the class procedure is not the most convenient or the best way to resolve this issue. It had the opportunity to review the evidence presented to it on these issues. Does that all depend on the notion that one troubled teen's fixing fence is therapy and another troubled teen's fixing fence is labor? Is that what you're saying? No, I don't think so. I think it's back to the way the evidence was presented to it. The evidence was presented to it. Let's just take some of the affidavits. There is a request for certification based upon a 17-hour workday where basically everything that happened during the course of a workday was gobbled up and presented. It said this is the basis for our claim. I think what Judge Scavdall said is wait a minute. Some of this might be on an individual basis, labor or forced labor, but some of this is also a chore. You presented to me, plaintiffs, a class that says it's all in one basket. You've given me, and I've looked at the affidavits, I've looked at the deposition testimony, and what I see here is what you presented is this class. That's disparity between almost every single person, including the main plaintiffs, not only on the issue of chores, but on the issue of damages as well. So you have these varying degrees. Well, we have lots of case law that says if you've got common questions, you can do damages separately even when they're individualized. So the damages part of the decision is troubling to me from the district court. I'm still not understanding what you're saying. It seems to me that the court is faced ultimately with a question. If they're forced to do their homework or they're urged or there's consequences if they don't do their homework, is that a chore or labor? And so we could decide, the court could decide, for every kid involved in this program, doing your homework is a chore. It's not something that falls under the TPVA. But fixing fences or putting in irrigation goes in the labor box. And for everyone in this class, if they were forced to do, if they were coerced to do labor in the form of fixing fences, putting in irrigation systems, then that, we can all agree for purposes of the class as a whole, goes in the labor bucket. So isn't this parsing out chore, labor, a common question that applies across the class? Well, you would have, that would assume that you could identify every single aspect of every single plaintiff for every single day during the entire class period and then going ahead and putting it into a column or a bucket so that you could say chore, labor. You can't do that. I think that's what Judge Skavdal was saying in the case that has, based upon the evidence that's presented to me. And I look at the Wal-Mart v. Duke's case and as quoted in Judge, as is quoted in Judge Skavdal's order, initial order, dissimilarities within the proposed class are what have the potential to impede the generation of common answers. So it's not the common questions, Your Honor. It's the common answers that matter. And here he's saying I can't get to common answers based upon the case that has been presented to me by the plaintiffs. Well, common answer, irrigating is labor. Common answer, fixing fences is labor. Common answer, peeling potatoes is a chore. I mean, aren't those common answers? Well, they could be if you could identify through all of them. But you have proposed 200 class members who you have to sift through what they're claiming are their daily issues and the base of their damages. Okay. Let me turn quickly to the damages aspect. My time is almost up and I want to talk real briefly about the damages. You know, and consider the totality plaintiffs. I think what we have to talk, look very quickly at here on the damages issues is that the plaintiffs want to, they again have put in entire days and presented themselves as 17, 24-hour days, 17 or 12-hour days. So basically doing hundreds of hours worth of work during the course of a month and saying that we want compensated for all of that. That's the plaintiff's case. And they also want emotional distress damages for this. They didn't take the time to sort out their damages case. And as a consequence of the failure to sort out the case, they presented this as a whole to Judge Scavdall and said, this is not a case where I can render damages as presented and requested in this class. Your Honor, I think I'm out of time. Other questions? Thank you. All right. Thank you, Mr. Glenn. And your time had expired, Mr. Timmons, but I'll give you a minute. Your Honor, I'd just like to take a moment to address the Dukes case since it was just raised. Dukes involved 1.5 million employees scattered over, I believe, 70 different regions. Each region had something like 50 stores, and each store had something like 50 different department heads. And so the putative class in Dukes could not establish a common question of law or a common theory of recovery under Title VII because of the disparity in the way that each of those managers would have applied their wrong obligations under Title VII. But here, it is undisputed in the record that there's a common scheme of punishment. There's a common scheme of labor. There is a common – there's a handbook. It's actually manualized how this is done, and it is recorded in daily logs, and it is the same people in the same installation, the same physical location, doing the same thing for the benefit of the same company. So this is completely distinct from the Dukes case. Thank you. All right. Thank you, counsel, for your arguments. The case is submitted. Counsel are excused.